IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| H.M.L., | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:24-cv-03919** |
| | : | |
| v. | : | **Judge Algenon L. Marbley** |
| | : | |
| **RED ROOF INNS, INC.,** *et. al.*, | : | **Magistrate Judge Kimberly A. Jolson** |
| | : | |
| **Defendants.** | : | |

## OPINION & ORDER

This matter comes before the Court on Defendant Harmony Hospitality, LLC's Motion to Dismiss Plaintiff H.M.L.'s Second Amended Complaint under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction. (ECF No. 67). For the reasons set forth below, Harmony's Motion is **DENIED**.

## I.    BACKGROUND

The instant case arises under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595. Plaintiff H.M.L. is a resident of South Carolina who, proceeding anonymously, alleges that she was the victim of sex trafficking at a Red Roof Inn hotel located in Greenville, South Carolina from March 1, 2012, through October 25, 2014. (ECF No. 53 ¶¶ 8–9, 26).[1] She sues four Red Roof entities: Red Roof Inns, Inc., RRF Holding Company, LLC, Red Roof Franchising, LLC, and RRI West Management, LLC (collectively, "Red Roof"). All four Red Roof Defendants were formed under Delaware law and have their principal place of business in Ohio. (¶¶ 12–16). She also sues Red Roof franchisee Harmony Hospitality, LLC. It is

---

[1] All parenthetical citations to paragraphs "(¶¶ _)" cite to H.M.L.'s operative Second Amended Complaint (ECF No. 53), unless otherwise stated. The Court takes all well-pleaded allegations in the Second Amended Complaint as true for the purposes of the Motions to Dismiss.

undisputed that Harmony operated the Greenville Red Roof Inn hotel during the relevant time period.[2]  (¶ 17; ECF No. 57-1 ¶¶ 4–5).

Plaintiff H.M.L.'s factual allegations are as follows:  She met two men in early 2012 who trafficked her until October 25, 2014.  She feared for her life and the life of her child because of these two men, who forced her to engage in commercial sex acts via fraud and coercion.  Approximately three to four times a week, this occurred at the Red Roof Inn hotel in Greenville, where the signs of H.M.L.'s trafficking were obvious, and her exploitation was "facilitated" by the Defendants.  (¶¶ 25–26, 28–30; see id. ¶¶ 37, 31–32).  In particular, Plaintiff alleges that there were "numerous obvious signs of trafficking" in her case, given:  the rooms were "frequently" paid for with cash or prepaid cards; her traffickers consistently obtained the hotel room and key and would drop her off in the parking lot; she would enter the hotel alone, without handling payment, and stay overnight, absent any personal items or luggage; the rooms were regularly located at the back of the property; there was "heavy foot traffic" into her rooms—men would enter and leave at unusual hours, including men who were not hotel guests; other women would be "rotated" into the same room by H.M.L.'s traffickers after she left; and H.M.L. was visibly under the influence of methamphetamine.  Plaintiff further alleges that Harmony employees did not ask her for identification while she was staying at the hotel, and multiple Harmony employees saw or became

---

[2] There is some uncertainty as to whether Harmony operated that hotel as a Red Roof Inn "[a]t all relevant times," as Plaintiff alleges, (¶¶ 17, 34–35), or whether Harmony assumed it based on a franchise agreement with Defendant Red Roof Franchising, LLC on July 17, 2013, as one of Harmony's managers avers is the case, (ECF No. 57-1 ¶ 5). Ultimately, this is not significant for the purposes of the instant Motion, because Harmony does not dispute that it operated the hotel for at least some of the relevant period of time.

aware of the signs of H.M.L.'s trafficking during the two years that she was trafficked at the hotel. (¶¶ 79–80).

Although Plaintiff was physically trafficked at Harmony's hotel in South Carolina, she connects the South Carolina franchisee to its Ohio-based franchisors.  Harmony "actively sought out a franchising relationship by contacting [Red Roof] in Ohio" and then entered into a franchising agreement based on Ohio law that required Harmony to:  submit to the jurisdiction of Ohio courts; "report information" regarding the hotel to Red Roof in Ohio; attend trainings and meetings in Ohio; participate in centralized Red Roof programs, such as reservation and payment systems; make payments to Red Roof in Ohio; and operate the hotel in accordance with policies promulgated and enforced from Ohio.  (¶ 22).

Thus, Plaintiff says Harmony's status as a Red Roof franchisee connected it to the Ohio-based Red Roof franchisor entities[3] in several ways.  First, Plaintiff asserts that Harmony's hotel staff and management were obligated, given the nature of Harmony's franchisee status, to report suspected criminal activity—including sex trafficking—to the Red Roof entities.  Those Red Roof entities "retained control" over the response of their hotels to human trafficking, including development of policies and procedures regarding detection of and response to human trafficking. (¶¶ 75, 90, 93; *see id.* ¶ 99).  Second, Plaintiff asserts that the Red Roof entities systemically controlled Harmony's hotel operations, including by controlling its payment processing system, its reservation system, its employee training, and its policies—including policies on human trafficking, cyber security, and internet access.  (¶¶ 22, 101, 108).  Last, Plaintiff asserts that the Red Roof entities obtained property- and consumer-specific data from Harmony, including "data

---

[3] Plaintiff alleges that all Red Roof Defendants were the franchisor, (¶ 15), though the franchise agreement appears to be between Harmony and Red Roof Franchising, LLC.  (*See* ECF No. 30-1).  Any distinction here is irrelevant for the purpose of deciding the instant Motion.

regarding guests' use of wi-fi," which Harmony was "required" to offer to hotel guests. (¶¶ 94, 97, 101). These allegations are critical because, according to H.M.L., Harmony not only failed to report suspicious trafficking activity, but it "[p]rovid[ed] the free Wi-Fi that [H.M.L.'s] trafficker used to advertise and solicit buyers to purchase commercial sex delivered by [H.M.L.]" at the hotel and then transmitted that data to the Red Roof franchisor entities in Ohio. (¶¶ 86, 97, 101–02, 108).

Harmony moved to dismiss H.M.L.'s Second Amended Complaint against it pursuant to Rule 12(b)(2). (ECF No. 57). Plaintiff responded, and Harmony replied. (ECF Nos. 67; 67). This Motion is now ripe for review.

## II.     STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(2) challenges the district court's personal jurisdiction over the case. The plaintiff bears the burden of establishing that personal jurisdiction exists over a defendant. *Opportunity Fund, LLC v. Epitome Sys., Inc.*, 912 F. Supp. 2d 531, 537–38 (S.D. Ohio 2012) (Marbley, J.) (citing *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007)). Where, as here, "the district court relies solely on written submissions and affidavits to resolve a Rule 12(b)(2) motion, rather than resolving the motion after either an evidentiary hearing or limited discovery, the burden on the plaintiff is 'relatively slight,' and 'the plaintiff must make only a prima facie showing that personal jurisdiction exists in order to defeat dismissal.'" *Air Prods. & Controls*, 503 F.3d at 549 (citations omitted). The plaintiff can make this showing by "establishing with reasonable particularity sufficient contacts between [the defendant] and the forum state to support jurisdiction." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002) (citation omitted). In deciding a Rule 12(b)(2) motion, a district court "must consider the pleadings and affidavits in a light most

4

favorable to the non-moving party," and "does not weigh the controverting assertions of the party seeking dismissal." *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996).

### III.    LAW & ANALYSIS

Harmony argues that there is no basis for this Court to exercise personal jurisdiction over it because when it was a Red Roof franchisee, it operated solely in South Carolina, and did not maintain sufficient minimum contacts with Ohio for the purposes of H.M.L.'s TVPRA suit.

Personal jurisdiction exists over a defendant if that defendant is "amenable to service of process" under the forum state's long-arm statute and if the exercise of personal jurisdiction would not deny it due process. *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002).   There are two categories of personal jurisdiction:  general and specific. *Intera Corp. v. Henderson*, 428 F.3d 605, 615 (6th Cir. 2005) (Marbley, J., by designation).

General jurisdiction exists when the defendant's contacts or affiliations with the forum state are "so 'continuous and systematic' as to render" the defendant "essentially at home" there. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945)).  For a corporation, this all-purpose general jurisdiction exists where it is fairly regarded at home—paradigmatically, "where it is incorporated or has its principal place of business." *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).

Specific jurisdiction, on the other hand, exists over out-of-state defendants where they have "'certain minimum contacts with [the State] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Goodyear*, 564 U.S. at 923 (quoting *Int'l Shoe*, 326 U.S. at 316).  It "depends on an 'affiliatio[n] between the forum and the underlying controversy,' principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation," and is "confined to adjudication of 'issues deriving

from, or connected with, the very controversy that establishes jurisdiction.'" *Id.* (citations omitted). The plaintiff must show that the out-of-state defendant "'purposefully directed' his activities at the residents of the forum," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)), "and the litigation results from alleged injuries that 'arise out of or relate to' those activities," *id.* at 472–73 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)).

## A.  General Personal Jurisdiction

Plaintiff is a resident of South Carolina and alleges that her trafficking occurred at Harmony's franchised Red Roof Inn hotel in Greenville, South Carolina. Although she alleges that the four Red Roof entities that she sues operate with their principal place of business in Ohio, the same cannot be said for Harmony. Harmony is a South Carolina limited liability company, and the Second Amended Complaint does not include any allegations that could show that Harmony would be essentially at home in Ohio. (*See* ¶ 17). Harmony argues that it is not subject to this Court's general personal jurisdiction, (ECF No. 57 at 4–5), and Plaintiff concedes that she does not invoke that form of personal jurisdiction. (ECF No. 66 at 4 n.2). Thus, Harmony is not subject to this Court's general personal jurisdiction. *See Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 502 (6th Cir. 2020) (no general personal jurisdiction where no allegations support it). But it may still be subject to specific personal jurisdiction.

## B.  Specific Personal Jurisdiction

In this case, subject matter jurisdiction arises under federal question jurisdiction. Thus, specific personal jurisdiction "exists if the defendant is amenable to service of process under the forum state's long-arm statute and if the exercise of personal jurisdiction would not deny the defendant due process." *Bird*, 289 F.3d at 871 (cleaned up).

6

### 1. *Ohio's Long-Arm Statute*

Under Ohio's long-arm statute, this Court would have specific personal jurisdiction over Harmony if Plaintiff's cause of action arises from Harmony "transacting any business" in Ohio. Ohio Rev. Code § 2307.382(A)(1); *accord Malone*, 965 F.3d at 502.

Since Ohio's long-arm statute was updated effective April 7, 2021, however, this Court also has specific personal jurisdiction over Harmony so long as it is "consistent with the Ohio Constitution and the United States Constitution." Ohio Rev. Code § 2307.382(C); *C.T. v. Red Roof Inns, Inc.*, 2021 WL 2942483, at *10 (S.D. Ohio July 1, 2021) (Marbley, J.) (noting that after Ohio's long-arm statute was updated, it became "coextensive" with the U.S. Constitution); *In re Hotel TVPRA Litig.*, 2023 WL 3075851, at *5 (S.D. Ohio Apr. 25, 2023) (Marbley, J.) (same). Thus, no separate analysis under Ohio's long-arm statute is necessary, as it is "coterminous with the limits of the federal Due Process Clause." *Grado v. Med., Indus., and Sci. Prods. Corp.*, 2025 WL 2227879, at *7 (S.D. Ohio Aug. 5, 2025); *see Angel's Dream, LLC v. Toledo Jet Ctr., LLC*, 721 F. Supp. 3d 601, 609–11 (N.D. Ohio 2024). The inquiry into Ohio's long-arm statute collapses into the analysis of Harmony's due process rights.[4]

### 2. *Due Process Requirements*

The Sixth Circuit has set forth three requirements to protect the due process rights of a defendant and determine whether specific personal jurisdiction exists: (1) the defendant "must

---

[4] Both parties address the requirements of Ohio's long-arm statute independently from federal due process. Harmony argues that Plaintiff must establish that it was transacting business in Ohio under Ohio Rev. Code § 2307.382(A)(1) but cannot, based on the allegations in the Second Amended Complaint. (ECF No. 57 at 5–8). For her part, Plaintiff notes that it is an "open question whether Ohio's long-arm statute is coextensive with federal constitutional limits," and agrees that Ohio Rev. Code § 2307.382(A)(1) applies. (ECF No. 66 at 4). Though some courts have determined that Ohio Rev. Code § 2307.382(C) *did not* make Ohio's long-arm statute coterminous with federal due process, *e.g.*, *Doe v. Varsity Brands, LLC*, 2023 WL 4935933, at *7–8 (N.D. Ohio Aug. 2, 2023) (collecting cases and finding it "uncertain" whether Ohio's long-arm statute is now coterminous), that is inconsistent with this Court's approach, as well as the view of "[m]ost of the courts" that have addressed the issue. *AmaTech Grp. Ltd. v. Fed. Card Servs., LLC*, 2022 WL 44674, at *5 (S.D. Ohio Jan. 5, 2022) (collecting cases).

purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state"; (2) "the cause of action must arise from [or relate to] the defendant's activities there"; and (3) "the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *Intera Corp.*, 428 F.3d at 615 (quoting *S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)).

Harmony challenges each element of due process.

### a. Purposeful Availment

First, Harmony argues that it did not purposefully avail itself of the privilege of acting in Ohio. Harmony conclusorily asserts, in two sentences, that while it had a business relationship with the Ohio-based Red Roof, that relationship was "to operate a hotel in South Carolina under Red Roof's branding," and Harmony "did not seek to conduct business in Ohio, but rather to operate a hotel outside of Ohio." (ECF No. 57 at 9).[5] Plaintiff counters that as a matter of law, Harmony established minimum contacts "when it voluntarily entered into a long-term franchising relationship with an Ohio-based entity and directed its business operations, including payments, reports, and ongoing compliance, toward the forum." (ECF No. 66 at 9–10).

The Supreme Court has repeatedly "emphasized that parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King*, 471 U.S. at 473 (quoting *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 647 (1950)). Harmony purposefully availed itself of the privilege of acting in Ohio when it sought to do business with and become a franchisee of an Ohio franchisor. But the inquiry does not end with the mere

---

[5] In its reply brief, Harmony does not advance any further argument on this point. (*See* ECF No. 67 at 4).

existence of Harmony's (former) franchise contract.  Plaintiff has made a slew of allegations that connect Harmony and its franchised hotel to Ohio.  For instance, she alleges that Harmony's status as a Red Roof franchisee meant that its payment processing, operations, policies, and employee training all involved its Ohio-based franchisors.  She also alleges that Harmony's contacts with Ohio include transmitting electronic information to Red Roof in Ohio.  Based on the Second Amended Complaint, that information contained "data regarding guests' use of wi-fi" that would show H.M.L.'s trafficker advertising and soliciting her for commercial sex, and could relate to Harmony's purported failure to report this information.  (¶¶ 86, 97, 101, 108).

Via affidavit, Harmony's manager acknowledged that Harmony submitted to Ohio jurisdiction under the franchise agreement, but averred that Harmony "did not consent to Ohio's jurisdiction for disputes with third parties," no Harmony employees traveled to Ohio for training while the hotel was operated by Harmony, and that Harmony sold the hotel in March 2023.  (ECF No. 57-1 ¶¶ 6, 8–9).  This affidavit does not fundamentally undermine most of the well-pleaded allegations that connect Harmony to Ohio.  Certainly, Plaintiff's invocation of this Court's specific personal jurisdiction does not rise or fall on whether Harmony employees traveled to Ohio for training in light of Plaintiff's other allegations, including the key allegation that Harmony transmitted Wi-Fi data of H.M.L.'s trafficking to Ohio.

Plaintiff alleges that Harmony "intentionally direct[ed]" its Wi-Fi data, including data it obtained by virtue of H.M.L.'s trafficking, to the Red Roof entities and into Ohio "in the context of an ongoing business relationship." *Greif Packaging, LLC v. Transcend Transit, LLC*, 2026 WL 554698, at *17 (S.D. Ohio Feb. 27, 2026).  This is "sufficient to show purposeful availment, at least where those very [data transmissions] form [a] basis of the claim." *See id.* (discussing fraudulent communications).  By sending this data to Red Roof, Harmony "reached the state of

9

Ohio through [its] computer wires," *see The Rightthing, LLC v. Brown*, 2009 WL 249694, at *5 (N.D. Ohio Feb. 2, 2009) (discussing theft of trade secrets from an Ohio-based database to California), transmitting electronic data directly relevant to Plaintiff's claims to Red Roof in Ohio. In doing so, Harmony expressly aimed allegedly wrongful conduct at Ohio.  It provided free Wi-Fi to its hotel guests, through which H.M.L. was allegedly "advertise[d] and solicit[ed] for commercial sex," and then gathered and transmitted that "customer data" to Ohio.  (¶ 108); *see Briskin v. Shopify, Inc.*, 135 F.4th 739, 758 (9th Cir. 2025) (en banc) (holding that, where a plaintiff alleged data collection in violation of data privacy laws, defendant e-commerce platform "'expressly aim[ed]' its wrongful conduct toward a forum state when its contacts [were] its 'own choice and not random, isolated, or fortuitous'" even if its actions were not expressly aimed at that forum); *see also generally Power Investments, LLC v. SL EC, LLC*, 927 F.3d 914, 918–19 (6th Cir. 2019) ("The reality that modern business often occurs electronically . . . will not defeat personal jurisdiction.").

This Court need not determine whether the franchise relationship alone, or allegations of payment processing, operations, policies, or employee training by a franchisor establish specific personal jurisdiction over an out-of-state franchisee hotel.  Well-pleaded allegations that the franchisee sent Wi-Fi data to its franchisor are enough, standing alone, to show purposeful availment, if the plaintiff's allegation is that the Wi-Fi data directly related to her trafficking.  Thus, the first element is met.

### b. Cause of Action

Next, Harmony argues that Plaintiff's TVPRA lawsuit is unrelated to its business activities with ties to Ohio.  Plaintiff's lawsuit proceeds under the TVPRA's beneficiary theory of liability. To succeed under this theory, Plaintiff must show:  (1) that Harmony knowingly benefitted, or

10

attempted or conspired to benefit; (2) from participating in a venture; (3) that it knew or should have known was engaging in human trafficking in violation of 18 U.S.C. §§ 1581–97.  18 U.S.C. § 1595(a); *see, e.g.*, *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 964 (S.D. Ohio Oct. 7, 2019) (Marbley, J.); *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 553 (7th Cir. 2023).  The requirement that Plaintiff's suit *arise out of* or *relate to* Harmony's contacts with Ohio is "subject to a lenient standard."  *Carbone v. Kaal*, 140 F.4th 805, 813–14 (6th Cir. 2025) (citation and internal quotation marks omitted); *Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 592 U.S. 351, 359 (2021).

Harmony points out that the alleged trafficking occurred in South Carolina and argues that "[t]here is no evidence that Plaintiff's cause of action arose from" Harmony's alleged activities in Ohio.  (ECF No. 57 at 9).

Plaintiff counters that Harmony misstates the law, and the question is whether her injury "is substantially connected" to Harmony's conduct purposefully directed at Ohio.  (ECF No. 66 at 12).  Plaintiff points to two cases in the Eastern District of Texas, where each time the court found that it had specific personal jurisdiction over non-resident franchisees due to the "intertwined" nature of the TVPRA beneficiary claim and the franchisees' forum-directed conduct relating to their "sustained" business relationships with the franchisor.  (*Id.* at 13 (citing Order at 16, *T.D.B. v. G6 Hospitality, LLC*, No. 9:23-cv-00174 (E.D. Tex. Sept. 30, 2024); Order at 12–18, *B.N.T. v. G6 Hospitality, LLC*, No. 9:23-cv-00198 (E.D. Tex. Sept. 30, 2024)).  Plaintiff argues that this Court should reach the same conclusion, finding that each element of the TVPRA beneficiary theory is not only met, but relates to Harmony's Ohio contacts because Harmony:  (1) knowingly benefitted financially from room rentals that were processed through Red Roof's Ohio-based reservation and payment systems; (2) remitted part of the revenue to Red Roof; (3) participated in

11

the trafficking venture in part by jointly renting rooms to H.M.L.'s trafficker with Red Roof while Harmony's hotel was "operationalized" and governed by Ohio-based systems, "standards, policies, and compliance directives developed and enforced by [Red Roof] from its Ohio headquarters"; and (4) knew or should have known that trafficking was occurring in its hotel, at least in part because of Red Roof's "centralized compliance infrastructure in Ohio." (ECF No. 66 at 13–15). Under this argument, Harmony's focus on the physical location of trafficking is too narrow, because the trafficking in South Carolina was allegedly "facilitated" by Harmony's broader business structure as a Red Roof franchisee. (*Id.* at 15).

In reply, Harmony argues its business connection to Ohio via Red Roof is "incidental," and this Court should follow the reasoning of a recent District of Maryland case, *J.S.H. v. Choice Hotels Int'l, Inc.*, where the court rejected personal jurisdiction over an out-of-state franchisee, despite the franchisee's business relationship with the franchisor. (ECF No. 67 at 4 (citing *J.S.H. v. Choice Hotels Int'l, Inc.*, 2025 WL 2108792, at *7 (D. Md. July 28, 2025)). Harmony points out that Plaintiff's allegations regarding cash or prepaid card payments are "identical to the claims made" by the plaintiff in that Maryland case, just as Plaintiff's allegations regarding the franchising model and franchisor policies, as well as her theory of the venture element, share further similarities. (*Id.* at 5–6).

True, there is some uncertainty as to when, if ever, a district court may exercise specific personal jurisdiction over a non-resident hotel franchisee in the franchisor's forum state, as the divide between *J.S.H.* on the one hand and *T.D.B.* and *B.N.T.* on the other indicates. In *J.S.H.*, the district court determined, after holding a hearing that discussed the contours of the franchise agreement at issue: (1) the franchisor's setting of national policies or taking of a percentage of revenue could not support personal jurisdiction because these actions would not establish the

12

*franchisee*'s contacts with the forum; (2) renting rooms, operating a hotel, and following a franchisor's national policies *occurred* in the hotel's state, and also could not establish contacts with the franchisor's forum; and (3) where the complaint alleged "traffickers often paid in cash" and the franchise agreement "did not require remittance . . . of room revenues from specific transactions," the remaining "general payment of monthly franchise fees" were insufficiently related to the claim. *J.S.H.*, 2025 WL 2108792, at *6–7, *9 (D. Md. July 28, 2025).  Several courts have followed this reasoning.  *See J.T.A. v. Wyndham Hotels & Resorts, Inc.*, 2026 WL 73727, at *4 (D.N.J. Jan. 9, 2026) (finding that a franchise agreement governed by forum state law, where the franchisee was required to coordinate reservations, process payments, collect feedback, and review data, was insufficient  to create a connection with the forum state); *S.A.T. v. Wyndham Hotels & Resorts, Inc.*, 2025 WL 2848587, at *4 (D.N.J. Oct. 8, 2025) (finding that a franchise agreement governed by forum state law, where the franchisee was required to process payments, make reports, and meet training obligations, was insufficient to create a connection with the forum state).

By contrast, another district court found specific personal jurisdiction over franchisee hotels, determining that an out-of-state franchisee's relationship with a franchisor can provide sufficient minimum contacts and TVPRA claims can "result from" the franchisor's forum contacts, being "interwoven" with the franchising relationship.  Order at 13–19, *B.N.T.*, No. 9:23-cv-00198; Order at 12–17, *T.D.B.*, No. 9:23-cv-00174.  And this Court has previously suggested—albeit in dicta, in passing, and in the context of addressing a motion to transfer venue—that a plaintiff's trafficking claims against a Red Roof franchisee *may* arise out of the franchisee's contacts with Ohio through its relationship with the Red Roof franchisors.  *J.N.K. v. Red Roof Inns, Inc.*, 2025 WL 772150, at *7 (S.D. Ohio Mar. 11, 2025) (Marbley, J.).

13

Ultimately, these cases show that this is a fact-specific determination.  The court in *J.S.H.* recognized as much.  It distinguished the reasoning of *B.N.T.*, noting that the facts differed insofar as the *B.N.T.* plaintiff had alleged, without being controverted, that payments were being processed in the forum state.  *J.S.H.*, 2025 WL 2108792, at *9 (also rejecting *B.N.T.*'s reasoning insofar as it found specific personal jurisdiction based on franchisor policies addressing human trafficking and criminal activity).  Here, the facts are again distinct.  As discussed, Plaintiff has alleged that Harmony provided Wi-Fi and sent collected internet data, including data that Plaintiff's trafficker used to advertise and solicit H.M.L.'s sexual exploitation, from its hotel in South Carolina to Red Roof headquarters in Ohio as a regular part of its business operations.  Taking Plaintiff's well-pleaded allegations as true, as this Court must, Harmony digitally reached out to Ohio in a way that directly relates to Plaintiff's case.  *Cf. The Rightthing, LLC*, 2009 WL 249694, at *5.  Neither *J.S.H.* nor the cases following its reasoning involved similar allegations.  *Compare J.S.H.*, 2025 WL 2108792, at *3 (only discussing general allegation regarding the *franchisor's* knowledge of trafficking due to its "provision of internet services" to franchisee); *J.T.A.*, 2026 WL 73727, at *4 (no discussion of franchisee sending internet data to franchisor); *S.A.T.*, 2025 WL 2848587, at *1 (same).

These data transfers help form the basis of Plaintiff's TVPRA claim against all Defendants, as they implicate the elements of the beneficiary theory of liability.  *See M.A.*, 425 F. Supp. 3d at 964.  Each transfer was certainly more than the "mere transmission of information" passing through a server, *Carbone*, 140 F.4th at 812, because it involved the transmission of information that Harmony *was required to collect and send to Ohio* as part and parcel of its hotel business.  *Cf. A.A. v. Omnicom Grp., Inc.*, 2026 WL 504904, at *8 (S.D.N.Y. Feb. 24, 2026) (evaluating TVPRA claims of foreigners who worked on Qatar's 2022 World Cup and finding "relatedness" met for

Dubai-based public relations firm responsible for rehabilitating Qatar's image where the complaint's allegations about that firm's work made it "reasonable to infer" as much). The second element is also met.

### c. Reasonableness

Finally, Harmony argues that specific personal jurisdiction in Ohio would be unreasonable. To determine whether exercising jurisdiction over the defendant is "reasonable" under the third requirement, courts consider the burden on the defendant, the interests of the forum state, and the plaintiff's interest in obtaining relief in that particular forum. *Beydoun v. Wataniya Rest. Holding, Q.S.C.*, 768 F.3d 499, 508 (6th Cir. 2014) (citing *Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 113 (1987)). Where the first two requirements of due process are met, "there is an inference that the reasonableness prong is satisfied as well." *Intera Corp.*, 428 F.3d at 618. Because Harmony has purposefully directed its activities to Ohio, it "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477.

Harmony points out that its business contacts with Ohio ended in 2023, Ohio's "interest in this litigation is minimal as the underlying trafficking solely occurred in South Carolina," and its only connection to Ohio is its former franchise agreement with Red Roof. (ECF No. 67 at 8; *see* ECF Nos. 57 at 10; 57-1 ¶¶ 10–11). Thus, it says that it would be burdened by having to litigate in Ohio given that it presently lacks any business connection to the state, Ohio's interest in any suit against Harmony is "negligible" given its lack of connection to the state, and Plaintiff's interest would be better-served by seeking relief in her home state of South Carolina, where the alleged trafficking occurred. (ECF No. 57 at 10–11).

15

To Plaintiff, Harmony has simply rehashed its prior arguments.  Plaintiff argues that because Harmony voluntarily entered into the franchise agreement with Red Roof—subject to Ohio choice-of-law provisions and ongoing obligations and interactions with Red Roof in Ohio— the exercise of jurisdiction would not be unreasonable because Harmony intentionally sought the benefit of transacting business there and could have anticipated being sued in Ohio courts.  (ECF No. 66 at 16–17).  Moreover, Plaintiff points out that she has a strong interest in suing in Ohio, and Ohio has a strong interest in adjudicating this dispute, because Plaintiff's claims are brought in part against the Ohio-based Red Roof Defendants.  (*Id.* at 17).

Harmony has not shown that the exercise of specific personal jurisdiction over it in Ohio would be unreasonable or implicate its due process rights.  First, Harmony elected to enter into a business agreement to franchise a hotel from Red Roof, and Red Roof is based in Ohio.  That Harmony may have to defend itself in Ohio from litigation surrounding its operation of the hotel should come as no surprise, particularly when Harmony submitted to Ohio's jurisdiction for certain disputes that might arise out of its franchise agreement with Red Roof.  (ECF No. 56-1 § 17.7). Although the instant claims are distinct from those that might have arisen directly out of the franchise agreement, they certainly relate to Harmony's former status as a Red Roof franchisee. Harmony allegedly sent Wi-Fi data to its Red Roof franchisors in Ohio that directly relates to Plaintiff's TVPRA claims.  Though Harmony is a South Carolina company and would be burdened by defending a lawsuit in Ohio, it knew such a suit could be a possibility when it became a Red Roof franchisee.  *Opportunity Fund*, 912 F. Supp. 2d at 540–41.

The Red Roof Defendants are based in Ohio, and Plaintiff's allegations implicate Harmony's business relationship with Red Roof—including Harmony's activities directed at the state.  Ohio certainly has an interest in adjudicating this case given that the Red Roof Defendants

16

are headquartered here, and Plaintiff has an interest in seeking relief here for that same reason. *See, e.g.*, *J.N.K.*, 2025 WL 772150, at *7 (addressing venue and noting that "[g]iven [Red Roof's] presence in this district, this Court routinely permits similar claims against them to proceed here, even if the alleged trafficking took place elsewhere"); *In re Hotel TVPRA Litig.*, 2023 WL 3075851, at *10.  The exercise of personal jurisdiction would not be unreasonable.  Therefore, Harmony's due process rights would not be violated by the exercise of jurisdiction over it in this matter.

## IV.    CONCLUSION

Under the facts of this case, Harmony has sufficient contacts with Ohio to justify personal jurisdiction over it because it sought out a business relationship with Red Roof.  As a Red Roof franchisee, Harmony allegedly was obligated to transmit electronic data regarding guest Wi-Fi use to Ohio.  According to Plaintiff, this data included information about her trafficking at Harmony's franchised hotel.  Thus, Plaintiff's cause of action relates to Harmony's Ohio contacts.  Exercise of specific personal jurisdiction over Harmony in Ohio would be reasonable given its ties to the state as a former Red Roof franchisee, and the fact that Plaintiff's claims arise in part out of those ties.  Harmony's Motion to Dismiss (ECF No. 57) the Second Amended Complaint is **DENIED**.

Additionally, Harmony still has a pending, earlier Motion to Dismiss (ECF No. 48) the Amended Complaint (ECF No. 26).  Generally, amended complaints supersede the earlier complaints, "thus making the motion to dismiss the [earlier] complaint moot."  *Green v. Mason*, 504 F. Supp. 3d 813, 826 (S.D. Ohio 2020); *see also G.P. v. Wyndham Hotels & Resorts, Inc.*, 2023 WL 5018562, at *1 (S.D. Ohio Aug. 7, 2023) (Marbley, J.) (denying motion to dismiss former complaint as moot following amended complaint).  The Amended Complaint is no longer the operative pleading, and Harmony's Motion to Dismiss the Second Amended Complaint

17

commenced new briefing.  Thus, Harmony's earlier Motion to Dismiss (ECF No. 48) is **DENIED as MOOT**.

       **IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:  March 30, 2026**

18